# United States Court of Appeals
# for the Fifth Circuit

―――――――――

No. 25-50717

―――――――――

Samantha Liedtke,

*Plaintiff—Appellant*,

*versus*

The City of Austin,

*Defendant—Appellee*.

―――――――――――――――――――――――――

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:23-CV-803

―――――――――――――――――――――――――

Before Willett, Engelhardt, and Douglas, *Circuit Judges*.

Don R. Willett, *Circuit Judge*:

Former Austin Police Department Officer Samantha Liedtke says APD recruited her onto an all-male patrol shift because the Department "needed a female officer"—then punished her after she complained that the shift had become hostile to female officers. The district court granted the City summary judgment across the board, concluding that no challenged act affected the terms, conditions, or privileges of her employment and that Liedtke suffered no adverse employment action.

United States Court of Appeals
Fifth Circuit

**FILED**

August 3, 2026

Lyle W. Cayce
Clerk

No. 25-50717

We affirm only as to hostile work environment because Liedtke did not adequately brief that claim as a freestanding issue on appeal. But her sex-discrimination and retaliation claims present fact-bound disputes under Rule 56 and our post-*Hamilton* Title VII cases. Viewing the record in the light most favorable to Liedtke, a jury could find that the City's Employee Success Plan and the circumstances surrounding her resignation altered the terms, conditions, or privileges of her employment, and that sex-based or retaliatory motives played a role.

We therefore AFFIRM in part, REVERSE in part, and REMAND.

## I. Background

Samantha Liedtke graduated from the Austin Police Academy in 2020, earning the "Honor Cadet" award for outstanding academics, fitness, and defensive tactics. After she joined APD, two supervisors on the all-male Edwards 400s patrol shift—Corporal Jon Stephenson and Sergeant Jesse Sanchez—recruited her to the team. They testified that they did so in part because she is a woman and they wanted to improve diversity. Lieutenant Courtney Daniel likewise stated that she approved Liedtke for the shift because the team "needed a female officer." On that record, Liedtke says her all-male peers "believed (correctly) that she received her position based on her sex."

According to Liedtke, the assignment quickly curdled. Her colleagues made "[n]ear-daily" sexist comments about women generally and female officers in particular. Four colleagues—Corporal Stephenson and Officers Michael Colaianni, Craig Pruitt, and Michael Wilkes—were, she says, especially hostile.

On Liedtke's telling, Stephenson and other shiftmates went "out of [their] way" to criticize the police work, physical appearance, and sexuality of female officers. Stephenson also allegedly ridiculed Sergeant Pamela

2

No. 25-50717

McBee for her weight, and criticized Lieutenant Daniel for her pregnancies and motherly responsibilities. Additionally, Liedtke testified that Stephenson discouraged her from socializing with female colleagues who filed workplace complaints to avoid "associat[ing] with drama." According to Liedtke, at least five officers—including Stephenson and Colaianni—uttered a common department adage that female APD officers are "either a bitch or a slut," with one officer opining that "it's better to be a bitch than a slut."

Liedtke says the hostility eventually found her. Although she insists she never mentioned her "Honor Cadet" award, Pruitt mocked it as "fucking awesome," and Colaianni suggested she earned it because "pretty women get easy accolades." Another APD officer, Benton Coker, wondered aloud whether hormonal birth control was impeding her muscle growth. And although her shiftmates ordinarily patrolled in pairs, Liedtke says she was left to patrol alone.

One evening, Liedtke says, she saw Pruitt and Wilkes "hunting" for a warrant outside a smoke shop rather than answering citizen calls as ordered. She messaged them to prioritize incoming calls for help. Wilkes stated that the message "upset and offended" both men. Around nine or ten that night, they asked Liedtke to meet them in a parking lot to discuss what they viewed as disrespect.

At that late-night, parking-lot meeting, the conflict became explicit. Liedtke says the conversation lasted about twenty minutes and that Pruitt and Wilkes berated her in crude and threatening terms. In her deposition, Liedtke testified that Pruitt said she "look[s] fucking horrible." Wilkes himself recalled telling Liedtke that the two of them should "drop belts"—that is, remove their gear belts and fight. Pruitt was reprimanded for threatening Liedtke; the record contains no comparable discipline for Wilkes. Later that evening, Liedtke responded to an active-shooter call and alleges Pruitt and

3

Wilkes retaliated by refusing to provide on-scene backup. They deny retaliation and say they were taking a bathroom break when Liedtke called for help.

Despite her shiftmates' behavior, Liedtke completed her field training in the fastest time possible (90 days) and received fourteen evaluations praising her "progress, attitude, professionalism, proficiency in law, policy, and procedure, and 'exceptional' performance." Upon graduating to solo-patrol status, she continued earning positive reviews.

Before formally complaining about her colleagues' hostility, Liedtke states that she alerted Corporal Stephenson of their behavior. Stephenson, according to Liedtke, would often commiserate with her regarding the issues that female police officers—including his own wife—face in a male-dominated workforce. Following the parking-lot incident, Liedtke reported to Stephenson that her colleagues' misconduct had escalated. In response, Stephenson led a mediation conference involving Liedtke, Pruitt, and Wilkes, which Liedtke asserts was "one-sided" and concluded with an agreement to disagree. Stephenson suggested that he took no further action on Liedtke's complaints because he was retiring in a couple of months, and he thought it was best for his replacement—Sergeant McBee—to resolve the workplace dispute. Dissatisfied with Stephenson's assistance, Liedtke contacted the APD's peer support program and was advised to report the mistreatment to her incoming shift supervisor.

Once McBee assumed Stephenson's supervisory role, Liedtke met with her to discuss Pruitt's, Wilkes's, and Colaianni's misconduct. McBee said she did not investigate or address those complaints because she believed Stephenson's mediation had resolved them and because she lacked time to respond before Liedtke resigned.

Six days later, Officer Colaianni—who was on parental leave—visited McBee's office and immediately told her that he and his male shiftmates were concerned Officer Liedtke "would file an EEOC or [internal-affairs] complaint" against them. In the same conversation, Colaianni said that Liedtke had caused "officer safety issues" on multiple occasions. McBee immediately summoned Pruitt to describe Liedtke's allegedly dangerous policing. Colaianni and Pruitt then identified four incidents in which they claimed Liedtke presented officer-safety issues. After the meeting, Pruitt texted McBee with more allegations against Liedtke.

The next day, McBee prepared an Employee Success Plan (ESP) documenting the accusations against Liedtke and identifying areas for improvement. The ESP resembled a performance-improvement plan. McBee acknowledged that, in crafting it, she "essentially copied and pasted" the allegations in Pruitt's text messages and changed only "a few things." The ESP addressed several-months-old incidents, two of which a prior supervisor had already handled. Lieutenant Daniel signed off on the ESP, and it was issued to Liedtke. Daniel testified that she would not have approved it had she known that Pruitt—one of the officers Liedtke had complained about—drafted much of it himself.

Travis Norton, Liedtke's police-practices expert, testified that the allegations against Liedtke "did not rise to the level" of meriting an ESP.[1]

---

[1] At the district court, the City moved to exclude Norton's expert report and testimony. The district court referred the motion to a magistrate judge but entered summary judgment without resolving it. Because the district court dismissed the case without ruling on the motion to exclude, that motion is not before us. *See, e.g.*, *Walmart Inc. v. DOJ*, 21 F.4th 300, 307 n.2 (5th Cir. 2021) ("Because it dismissed the present case, the district court did not rule on the motion to transfer, and that motion is not before this court."). We therefore do not decide whether Norton's opinions are admissible under Federal Rule of Evidence 702. For present purposes, we assume only that the cited portions

He also observed that "McBee failed to properly investigate . . . Liedtke's complaints against Officer[s] Pruitt and Wilkes." Next, he stated that the ESP "was unusual" because it "covered several months" worth of alleged misconduct. The City does not dispute that McBee's own experience corroborates Norton's opinion. Allegedly, she had never before issued or heard of a vague "officer safety" ESP based on months-old conduct that another supervisor had already resolved. Finally, Norton testified that McBee's decision to quote Pruitt's text messages nearly verbatim "show[ed] a lack of independent review."

Liedtke resigned a few weeks after receiving the ESP. Approximately three months later, she filed a timely charge of discrimination with the Equal Employment Opportunity Commission (EEOC).[2] Two years later, the agency notified Liedtke of her right to sue. On the very final day of the applicable limitations period, Liedtke sued the City under Title VII for fostering a hostile work environment, sex discrimination, and retaliation.[3]

On cross-motions for summary judgment, the district court rejected all three of Liedtke's claims. It granted summary judgment to the City on Liedtke's hostile work environment claim after finding that she had not shown an effect on the "terms, conditions, or privileges of her

---

could be presented in admissible form at trial. *See* Fed. R. Civ. P. 56(c)(2). The district court remains free to address any renewed evidentiary objections on remand.

[2] *See* 42 U.S.C. § 2000e-5(e)(1) ("A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred[.]").

[3] *See Stokes v. Dolgencorp, Inc.*, 367 F. App'x 545, 547 (5th Cir. 2010) (per curiam) (first citing 42 U.S.C. § 2000e-5(f)(1); and then citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002)). Liability under Title VII runs against the employer, not the individual employee whose acts violated the statute. *See Grant v. Lone Star Co.*, 21 F.3d 649, 652 (5th Cir. 1994).

employment."[4] And the court granted the City summary judgment on Liedtke's sex-discrimination and retaliation claims after concluding that she did not sustain an "adverse employment action."[5] Liedtke asks us to reverse the district court's entry of summary judgment for the City and remand the action. We AFFIRM summary judgment on Liedtke's hostile work environment claim, REVERSE summary judgment on her sex-discrimination and retaliation claims, and REMAND the latter claims for proceedings consistent with this opinion.

## II. Summary-Judgment Standard

We review summary judgment *de novo*.[6] Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[7]

A fact is "'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."[8] And a dispute is "'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party."[9] In determining whether a factual issue

---

[4] *Liedtke v. City of Austin*, No. 1:23-cv-803, 2025 WL 2692041, at *2–5 (W.D. Tex. July 30, 2025) (citing *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).

[5] *Id.* (first citing *Badgerow v. REJ Props., Inc.*, 974 F.3d 610, 618 (5th Cir. 2020); and then citing *Anthony v. Donahoe*, 460 F. App'x 399, 402 (5th Cir. 2012)).

[6] *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014) (citation omitted).

[7] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("Summary judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party." (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986))).

[8] *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam) (citing *Anderson*, 477 U.S. at 248).

[9] *Id.* (citing *Anderson*, 477 U.S. at 248).

exists, we "view the facts and draw reasonable inferences in the light most favorable to the nonmoving party."[10] At the same time, we may not make credibility determinations or weigh competing evidence.[11] Those duties belong to juries, not judges.[12]

The moving party bears the initial burden of "informing the Court of the basis of its motion" and identifying portions of the record that "demonstrate the absence of a genuine issue of material fact."[13] Once the movant meets this burden, the nonmoving party must identify "specific facts" in the record that show "a genuine issue for trial."[14] If the nonmoving party fails "to offer proof concerning an essential element of its case," all other facts are necessarily immaterial and summary judgment is appropriate.[15] Importantly, the nonmovant "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'"[16]

## III. Discussion

This appeal separates one forfeited claim from two fact-bound ones. Liedtke did not adequately brief her hostile work environment claim, so we AFFIRM summary judgment on that claim. Her sex-discrimination and

---

[10] *Rayborn v. Bossier Par. Sch. Bd.*, 881 F.3d 409, 414 (5th Cir. 2018) (quotation omitted).

[11] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (collecting cases).

[12] *Id.* (citation omitted).

[13] *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 163 (5th Cir. 2006) (quoting *Celotex*, 477 U.S. at 323).

[14] *Id.* at 164 (quoting *Celotex*, 477 U.S. at 324).

[15] *Id.* at 164.

[16] *Turner*, 476 F.3d at 343 (quotation omitted).

No. 25-50717

retaliation claims are different. On those claims, the record contains genuine disputes of material fact that preclude summary judgment. We therefore REVERSE as to those claims and REMAND for further proceedings.

## A. The Hostile-Work-Environment Claim Is Not Properly Before Us

The district court denied Liedtke's hostile work environment claim after finding that her colleagues' behavior did not affect a "term, condition, or privilege of her employment."[17] On appeal, Liedtke failed to adequately brief the claim and, therefore, forfeits review.[18]

The Federal Rules of Appellate Procedure provide at least three briefing requirements that Liedtke disregarded with respect to her hostile workplace argument. First, "[t]he appellant's brief must contain, under appropriate headings . . . a statement of the issues presented for review."[19] Next, the brief "must contain . . . a concise statement of the case setting out the facts relevant to the issues submitted for review, describing the relevant procedural history, and identifying the rulings presented for review, with appropriate references to the record."[20] And third, the opening brief "must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies; and for each issue, a concise statement of the applicable standard of review."[21]

---

[17] *Liedtke*, 2025 WL 2692041, at *3–5 (citing *Ramsey*, 286 F.3d at 268).

[18] *See, e.g.*, *Indigenous Peoples of Coastal Bend v. U.S. Army Corps of Eng'rs*, 132 F.4th 872, 884 (5th Cir. 2025) (WILLETT, J., joined by JONES and ENGELHARDT, JJ.) (citations omitted); *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) (citations omitted).

[19] FED. R. APP. P. 28(a)(5).

[20] FED. R. APP. P. 28(a)(6).

[21] FED. R. APP. P. 28(a)(8)(A)–(B).

Measured against those rules, Liedtke's hostile work environment claim is not properly before us. The City correctly observes that Liedtke's 71-page brief focuses almost exclusively on her workplace retaliation claim. Liedtke does not dispute that characterization: her "opening brief admittedly focused on [the] retaliation claim for the simple reason that an adverse employment action is defined 'slightly more broadly' under the anti-retaliation provision than under the discrimination provision." She nevertheless argues that her one "comprehensive, interrelated challenge" preserves her hostile work environment claim. We disagree.

The Federal Rules and our precedents indicate that Liedtke missed straightforward briefing requirements. Her "statement of the issues" does not mention a hostile work environment claim.[22] That section lists five issues bearing on her workplace retaliation or sex-discrimination claims. Moreover, Liedtke's 23-page "concise statement of the case" presents only retaliation and sex-discrimination claims. In that section, she mentions a hostile working environment three times—once in stating that the district court rejected the claim, and twice in explaining that she suffered retaliation because she reported the hostile environment to her supervisor.

Liedtke's statements of the issues and case fail to "identify" the district court's judgment on her hostile work environment claim as an independent "ruling[ ] presented for review."[23] Instead, she *claims* that she was *retaliated against* because she reported the hostile workplace to her supervisor. Liedtke's infrequent references to hostility—which are

---

[22] *Cf.* FED. R. APP. P. 28(a)(5) (requiring "a statement of the issues presented for review").

[23] *See* FED. R. APP. P. 28(a)(6).

No. 25-50717

conjoined to her retaliation claim—are insufficient to raise a freestanding hostile work environment claim on appeal.[24]

The 27-page argument section in Liedtke's appellate brief fares no better. Under the Federal Rules, that section must state the "appellant's contentions and the reasons for them," include "citations to the authorities and parts of the record on which the appellant relies," and provide "the applicable standard of review" for each issue.[25] It does not.

Liedtke's argument section mentions a hostile work environment only three times—each time, within a subsection devoted to her retaliation claim. Liedtke asserts that she sustained retaliation because her coworkers feared that she would report them to the EEOC or internal affairs for creating a hostile work environment. But that is not enough to raise a freestanding hostile workplace claim. Instead, Liedtke's three references to hostility are factual allegations supporting her distinct retaliation claim.[26] She does not connect those allegations to "the applicable standard of review" for Title

---

[24] *See, e.g.*, *United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010) ("It is not enough to merely mention or allude to a legal theory. We have often stated that a party must 'press' its claims." (citation omitted)); *McIntosh v. Partridge*, 540 F.3d 315, 325 n.12 (5th Cir. 2008) ("McIntosh occasionally mentions an 'equal protection' claim in conjunction with his due process claim, but this claim is inadequately briefed and is hence waived."); *Davis v. Maggio*, 706 F.2d 568, 571 (5th Cir. 1983) (per curiam) ("Claims not pressed on appeal are deemed abandoned.").

[25] Fed. R. App. P. 28(a)(8)(A)–(B).

[26] *Cf. King v. DFW Int'l Airport Bd.*, No. 23-11084, 2024 WL 4132676, at *5 (5th Cir. Sept. 10, 2024) ("King essentially conflates *arguments* that he made to support his claim for disparate treatment with a *claim* for failure to accommodate that he nowhere briefs. But he cannot conjure such a claim by bootstrapping unrelated arguments pertaining to elements of a different claim.").

No. 25-50717

VII workplace hostility.[27] In fact, she mentions no legal authority regarding hostile work environment claims arising under Title VII.

Our court has previously rejected Liedtke's scattershot approach to briefing. Appellants cannot "conjure . . . a claim by bootstrapping unrelated arguments pertaining to elements of a different claim."[28] Under the Federal Rules of Appellate Procedure, each issue on appeal must be separately pleaded.[29] We applied that standard in *Equal Opportunity Employment Commission v. LHC Group*.[30] There, we held that the agency-appellant had forfeited an issue because the agency failed to devote a section of its opening brief to the issue, identify the claim in its statement of issues, and specify that the forfeited issue was intended as an independent claim—rather than as one component of a broader issue on appeal.[31] Liedtke's allegations of workplace hostility mirror the deficient briefing in *LHC Group*: she did not devote a section of her opening brief to a hostile work environment claim, identify the claim in her statement of issues, or specify that the issue was freestanding.

After the City identified Liedtke's forfeiture of the hostile work environment claim, she tried to revive the issue in reply. Although Liedtke's

---

[27] *See* Fed. R. App. P. 28(a)(8)(B). To prevail on a hostile work environment claim under Title VII, a plaintiff must demonstrate that: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment affected a term, condition, or privilege of her employment; and (5) her employer knew or should have known of the harassment and failed to take prompt remedial action. *Badgerow*, 974 F.3d at 617 (citation omitted).

[28] *King*, 2024 WL 4132676, at *5; *see also, e.g.*, *E.E.O.C. v. LHC Grp.*, 773 F.3d 688, 703 (5th Cir. 2014).

[29] Fed. R. App. P. 28(a)(8)(B) (requiring appellants to provide "the applicable standard of review" for each issue).

[30] *E.E.O.C. v. LHC Grp.*, 773 F.3d 688 (5th Cir. 2014).

[31] *See id.* at 703.

reply brief unpacks the hostile workplace claim, her efforts to raise the issue are untimely. "Arguments raised for the first time in a reply brief need not be considered."[32] So we decline to credit the issue as raised in Liedtke's reply brief.

Bottom line: Liedtke failed in multiple respects to preserve her hostile work environment claim. She did not identify the claim in her opening brief's "statement of issues" or (not so) "concise statement of the case."[33] Nor did she "address the district court's analysis" of her workplace hostility claim or "support [the] contention with legal arguments or authorities."[34] Because Liedtke's opening brief refers to a hostile work environment claim only "in passing" without developing the point into a "contention," she forfeits the issue on appeal.[35]

---

[32] *Indigenous Peoples of Coastal Bend*, 132 F.4th at 884; *see also Johnson v. Salter*, No. 25-50332, 2026 WL 1365082, at *7 (per curiam) (5th Cir. May 15, 2026) ("[A]n argument not raised in appellant's original brief as required by FED. R. APP. P. 28 is waived." (citations omitted)); *United States v. Bowen*, 818 F.3d 179, 192 n.8 (5th Cir. 2016) (per curiam) ("[A]ny issue not raised in an appellant's opening brief is forfeited."); *United States v. Ogle*, 415 F.3d 382, 383 (5th Cir. 2005) (per curiam) ("Our cases make it clear that an argument not raised in appellant's original brief . . . is waived." (citations omitted)).

[33] *See* FED. R. APP. P. 28(a)(5); FED. R. APP. P. 28(a)(6).

[34] *Rollins,* 8 F.4th at 397 n.1 (citation omitted); *Ghazi v. Blanche*, No. 25-60268, 2026 WL 1164829, at *5 (5th Cir. Apr. 29, 2026); *see Bernegger v. Dep't of Revenue*, 785 F. App'x 209, 211 n.1 (5th Cir. 2019) (per curiam) ("Bernegger does not cite any authority to support his argument. Therefore, this argument is abandoned." (citing *United States v. Ballard*, 779 F.2d 287, 295 (5th Cir. 1986))).

[35] *See United States v. Prado-Montoya*, 836 F. App'x 314, 314–15 (5th Cir. 2021) (Mem.) ("Because it is purely conclusory, unsupported by record citations and legal authorities, and in essence unbriefed, we reject Prado-Montoya's claim . . . . A matter merely mentioned in passing without being developed into an argument is inadequately briefed." (first citing *United States v. Cothran*, 302 F.3d 279, 286 n.7 (5th Cir. 2002); and then citing *Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993))); FED. R. APP. P. 28(a)(8)(A) ("[T]he appellant's brief must contain . . . appellant's contentions and the

## B. The Sex-Discrimination Claim Presents Triable Fact Disputes

The district court granted summary judgment to the City on Liedtke's Title VII sex-discrimination claim because it found no "adverse employment action." That ruling rests on three errors. First, the court considered only one route to proving intentional discrimination—the *McDonnell Douglas* framework for circumstantial evidence—though Liedtke also invokes direct evidence. Second, it misdefined adverse employment action as a question of legal interpretation, and discounted material evidence that Liedtke sustained an adverse employment action. And third, it applied a cramped understanding of "adverse employment action" that our en banc court rejected in *Hamilton v. Dallas County*.[36] We therefore REVERSE summary judgment on Liedtke's sex-discrimination claim and REMAND for further proceedings.

### 1. Liedtke Preserved Her Sex-Discrimination Claim

As a preliminary matter, the City argues that Liedtke forfeited her sex-discrimination claim by failing to adequately brief the issue on appeal. Liedtke, according to the City, did not establish an adverse employment action necessary to support her sex-discrimination or retaliation claims. The City is correct that Liedtke abandoned one of the three adverse actions she alleged at the district court: the allegation that the City blocked her transfer to another department. But she alleges that the City took two alternative

---

reasons for them[.]); *Rollins*, 8 F.4th at 397 (holding that inadequately briefed arguments are forfeited).

[36] *See* 79 F.4th 494, 506 (5th Cir. 2023) (en banc).

adverse employment actions when it (1) issued the ESP and (2) caused her constructive discharge.[37]

We disagree that Liedtke forfeited her sex-discrimination claim. Her opening brief contains a subsection entitled "Under the Rule 56 Standard a Reasonable Jury Could Find for Plaintiff on Her Discrimination and Retaliation Claims." Within that subsection, Liedtke cites the legal standards applicable to sex-discrimination cases relying on direct or circumstantial evidence. And she argues that the district court erred in exclusively applying the *McDonnell Douglas* framework when her discrimination claim also relies on direct evidence.[38] So we will review Liedtke's sex-discrimination claim.

2. Direct Evidence Changes the Rule 56 Analysis

We begin our review of Liedtke's sex-discrimination claim with the statutory text. Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[39]

---

[37] The City argues that Liedtke forfeited her constructive-discharge theory in the district court. The district court observed that she "did not plead constructive discharge" and did not brief it in her summary-judgment motion, but it assumed *arguendo* that the theory was properly before it. We do the same. Constructive discharge is not a standalone claim here; it is a theory of adverse action supporting Liedtke's Title VII claims. As the Supreme Court has recognized, "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995) (quoting *Yee v. Escondido*, 503 U.S. 519, 534 (1992)).

[38] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).

[39] 42 U.S.C. § 2000e–2(a)(1).

No. 25-50717

Interpreting that text, the Supreme Court holds that a plaintiff must show *intentional* discrimination in order to prevail in a Title VII suit.[40] The factual inquiry is whether "the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin."[41] A Title VII plaintiff must "prove discrimination by a preponderance of the evidence."[42]

Two methods exist for demonstrating intentional discrimination. The plaintiff can provide (1) direct evidence of discriminatory animus, or (2) circumstantial evidence that supports an inference of discrimination.[43] Because direct evidence of intentional discrimination is "rare," a plaintiff "ordinarily uses circumstantial evidence to meet the test set out in *McDonnell Douglas*."[44] But Liedtke's record contains both direct and circumstantial evidence of sex discrimination—and the district court applied only the analytical framework for circumstantial evidence.

What counts as direct evidence? It is "evidence that, if believed, proves the fact of discriminatory animus without inference or

---

[40] *See USPS Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see also Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004) ("The Title VII inquiry is 'whether the defendant intentionally discriminated against the plaintiff.'" (quotation omitted).

[41] *See Aikens*, 460 U.S. at 715 (citation modified).

[42] *Hill v. Miss. State Emp. Serv.*, 918 F.2d 1233, 1240 (5th Cir. 1990).

[43] *See E.E.O.C. v. J.M. Huber Corp.*, 927 F.2d 1322, 1327 (5th Cir. 1991) ("In the rare situation in which the evidence establishes that an employer openly discriminates against an individual, it is not necessary to apply the mechanical formula of *McDonnell Douglas* to establish an inference of intentional discrimination; the showing has already been made directly." (citation and brackets omitted)).

[44] *See Portis v. First Nat'l Bank*, 34 F.3d 325, 328 (5th Cir. 1994) (footnote omitted); *McDonnell Douglas Corp.*, 411 U.S. at 802–03.

presumption."[45] "A statement or document which shows 'on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action is direct evidence of discrimination.'"[46] Direct evidence of discrimination sometimes takes the form of an offensive slur in the presence of a person against whom the slur is intended.[47]

Applying this rule to Title VII sex discrimination, our court has held that "the kind of comments" made against the plaintiff-employee "in *Price Waterhouse v. Hopkins* . . . constitute direct evidence" of discrimination.[48] In that case, a Price Waterhouse partner described the plaintiff-employee as "macho."[49] Another suggested that she "overcompensated for being a woman."[50] A third advised her to take "a course at charm school."[51] And a fourth advised her to walk, talk, and dress "more femininely," "wear make-up, have her hair styled, and wear jewelry."[52]

But not all sexist comments reflect intentional discrimination under Title VII. Generally, stray insults alone do not evince discrimination.[53] We

---

[45] *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 765 (5th Cir. 2016) (quotation omitted).

[46] *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 579 (5th Cir. 2020) (WILLETT, J.) (quotations omitted).

[47] *See, e.g.*, *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993) (finding that racial slurs are direct evidence of discrimination).

[48] *See Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir. 1994) (per curiam) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989)).

[49] *See Price Waterhouse*, 490 U.S. at 235.

[50] *See id.*

[51] *See id.*

[52] *See id.*

[53] *See, e.g.*, *Patel v. Midland Mem. Hosp. & Med. Ctr.*, 298 F.3d 333, 343 (5th Cir. 2002) (quotation omitted); *Krystek v. Univ. of S. Miss.*, 164 F.3d 251, 256 (5th Cir. 1999);

consider four factors in determining whether offensive workplace comments constitute direct evidence of discrimination or only stray remarks: whether the comments are "(1) related to the plaintiff's protected characteristic; (2) proximate in time to the challenged employment decision; (3) made by an individual with authority over the challenged employment decision; and (4) related to the challenged employment decision."[54]

To have "authority over [a] challenged employment decision,"[55] a discriminatory employee need not be the ultimate decisionmaker.[56] Our circuit recognizes that a subordinate employee's discriminatory comments can be imputed to a workplace superior responsible for taking employment action. "Under the cat's paw theory, a subordinate employee's discriminatory remarks regarding a co-worker can be attributed to the workplace superior, ultimately the one in charge of making employment decisions, when it is shown that the subordinate influenced the superior's decision or thought process."[57] Thus, a discriminatory employee need not

---

*Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997) (citation omitted); *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41–42 (5th Cir. 1996) (citation omitted).

[54] *See Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 476 (5th Cir. 2015) (citation omitted).

[55] *See id.*

[56] *Laxton v. Gap Inc.*, 333 F.3d 572, 584 (5th Cir. 2003) ("Courts do not 'blindly accept the titular decisionmaker as the true decisionmaker.'" (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000))). *But see Nichols*, 81 F.3d at 41–42 ("To be probative, allegedly discriminatory statements must be made by the relevant decision maker." (citation omitted)).

[57] *Haire v. Bd of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 366 n.11 (5th Cir. 2013). "Cat's paw" comes from the fable of a monkey who persuades a cat to pull chestnuts from a fire; the cat burns her paw, while the monkey gets the chestnuts. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011). In employment-discrimination law, the term describes a biased subordinate's use of a formal decisionmaker as the conduit for the subordinate's discriminatory purpose. *See Haire*, 719 F.3d at 366 n.11.

*impose* the challenged employment decision in order to exercise "authority" over that same decision, so long as he influenced the superior's decision or thought process regarding the employment action.[58]

As mentioned above, the challenged employment decision must also be "an adverse employment action."[59] On this front, the district court erred plainly by classifying the adverse-action inquiry as a question of law, rather than a fact-bound query. The court mistakenly relied on First Amendment speech law instead of Title VII employment law.[60] As we have previously emphasized, however, "adverse employment action" has distinct meanings in the Title VII and First Amendment contexts.[61]

---

[58] *See, e.g.*, *Haire*, 719 F.3d at 365–66 ("[T]he ultimate decision to hire someone other than Haire was made by Chancellor Martin, not Rabalais, and the record does not indicate that Martin directly engaged in any discrimination or made any remarks regarding Haire's gender. Under the 'cat's paw' theory of liability, however, it is possible that Rabalais's remarks that he wanted 'to get rid of' Haire and that he would resign if a female were appointed Chief may be imputed to Martin, the formal decisionmaker, if Rabalais played a role in the ultimate selection." (footnote omitted)); *Russell*, 235 F.3d at 226 ("If the employee can demonstrate that others had influence or leverage over the official decisionmaker, and thus were not ordinary coworkers, it is proper to impute their discriminatory attitudes to the formal decisionmaker." (citation omitted)).

[59] *See Clark*, 952 F.3d at 588.

[60] *Liedtke*, 2025 WL 2692041, at *3 (erring in its reliance on *Breaux v. City of Garland*, 205 F.3d 150, 161 (5th Cir. 2000)).

[61] *Compare Hamilton*, 79 F.4th at 506 (defining adverse employment action in the Title VII context as "discrimination . . . because of a protected characteristic, with respect to hiring, firing, compensation, or the 'terms, conditions, or privileges of employment[.]'" (quotations omitted) *, with Breaux*, 205 F.3d at 157 (defining adverse employment action in the First Amendment context as a discharge, promotion, refusal to promote, or reprimand, and explaining that "[t]he reason for not expanding the list of adverse employment actions is to ensure that § 1983 does not enmesh federal courts in 'relatively trivial matters.'" (quotations omitted); *see Hamilton v. Dallas Cnty.*, 42 F.4th 550, 556 n.10 (5th Cir. 2022),("[T]he definition of 'adverse employment action' for First Amendment retaliation purposes is not identical to the definition for Title VII employment discrimination purposes."), *vacated en banc*, 79 F.4th at 506; *see also Benison v. Ross*, 765 F.3d 649, 659 (6th

No. 25-50717

In the Title VII context, pleading an "adverse employment action" requires a plaintiff to "allege facts plausibly showing discrimination in hiring, firing, compensation, or in the 'terms, conditions, or privileges' of his or her employment."[62] Thus, in determining whether an employment action is adverse, courts must ascertain whether the challenged action reflects discrimination, and, if so, whether the discrimination altered the terms, conditions, or privileges of the plaintiff's employment. Since issuing our en banc decision in *Hamilton*, we have held that a performance-improvement plan "constitute[s] an adverse employment action" insofar as evidence indicates harm to a plaintiff's "job title, grade, hours, salary, or benefits, or causes a diminution in prestige or change in standing among coworkers."[63] And—years before we broadened our definition of adverse employment action in *Hamilton*—we recognized that an employer's "constructive discharge" of its employee "qualif[ies] as an adverse employment action."[64]

---

Cir. 2014) (holding that adverse employment action in First Amendment retaliation cases is "'distinct' from the adverse-action standard used in traditional employment discrimination claims" (quotation omitted)); *Nixon v. Blumenthal*, 409 F. App'x 391, 392 ("[T]he term 'adverse employment action' has a different meaning in the context of a First Amendment retaliation claim than it does in cases brought under Title VII[.]" (citation omitted)); *Baca v. Sklar*, 398 F.3d 1210, 1218–19 (10th Cir. 2005) (distinguishing First Amendment adverse employment action from Title VII adverse employment action).

[62] *Hamilton*, 79 F.4th at 502–03.

[63] *See Lemonia v. Westlake Mgmt. Servs., Inc.*, No. 22-30630, 2023 WL 6878915, at *7 (5th Cir. Oct. 18, 2023) (per curiam) (citation modified); *id.* (evaluating "evidence" to determine whether the plaintiff's "placement on a PIP . . . affected his employment"); *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 827 (5th Cir. 2019); *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009).

[64] *See Thomas v. Atmos Energy Corp.*, 223 F. App'x 369, 376 (5th Cir. 2007) (first citing *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 439 (5th Cir. 2005); and then citing *Landgraf v. USI Film Prods.*, 968 F.2d 427, 431 (5th Cir. 1992) (footnote omitted)).

No. 25-50717

In sum, a Title VII discrimination suit requires a showing of intentional discrimination by a preponderance of the evidence.[65] Plaintiffs can prove intentional discrimination through direct or circumstantial evidence.[66] Direct evidence shows, on its face, that discriminatory animus partly (or fully) caused an adverse employment action.[67] And an adverse employment action is one that damages a plaintiff's terms, conditions, or privileges of employment.[68] Although offensive slurs can constitute direct evidence of employment discrimination, the remarks must relate to the plaintiff's protected characteristic and the adverse employment decision, and a person possessing authority over the employment action must have made the comments around the time of the challenged decision.[69]

A plaintiff who presents direct evidence of discrimination can defeat summary judgment unless the employer establishes by a preponderance of the evidence that it "would have made the same [employment] decision absent the evidence of discrimination."[70] To prevail on summary judgment,

---

[65] *See Hill*, 918 F.2d at 1240.

[66] *See J.M. Huber Corp.*, 927 F.2d at 1327 (citation omitted).

[67] *See Clark*, 952 F.3d at 579 (quotations omitted).

[68] *See Hamilton*, 79 F.4th at 506; *Lemonia*, 2023 WL 6878915, at *7 (first quoting *Welsh*, 941 F.3d at 827; and then quoting *Stewart*, 586 F.3d at 332 (internal quotation marks and alterations omitted)).

[69] *See Etienne*, 778 F.3d at 476.

[70] *See id.* at 477; *id.* at 475, 477 ("If . . . the plaintiff presents direct evidence of discrimination, 'the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor.'" (quotation omitted)); *see also, e.g.*, *Vance v. Union Planters Corp.*, 209 F.3d 438, 443 (5th Cir. 2000) ("Because we lack the jury's opportunity to observe Davis's demeanor and hear his voice, and because the statement corroborated Davis's comments that he wanted to hire a 'mature man,' . . . there was sufficient material direct evidence of discrimination to allow a reasonable jury to decide in Vance's favor. . . . To prevail, Union Planters must provide direct or circumstantial evidence to rebut that explanation for its

the employer "must do more than merely identify a legitimate basis for its decision—it must show that any reasonable jury would conclude that it *would* have made the same decision absent the discrimination."[71] A plaintiff can survive summary judgment if she, for example, "creates a jury issue as to the employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation."[72]

### 3. A Jury Must Decide What the Record Shows

This case does not present one clean legal question; it presents a thicket of factual disputes. And while many events are undisputed, their meaning is not.

Start with the shift itself. Pruitt was officially reprimanded after the parking-lot encounter. Wilkes admits telling Liedtke that they should "drop belts." Later that same night, when Liedtke called for backup, Pruitt and Wilkes did not respond. The City does not dispute that Coker asked about her contraception practices and said they might be interfering with muscle growth. And while male officers patrolled in pairs, Liedtke usually patrolled

---

employment decision." (citation omitted)); *Brown*, 989 F.2d at 861 ("When a plaintiff presents credible direct evidence that discriminatory animus in part motivated or was a substantial factor in the contested employment action, the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor." (citations omitted)); *McKibban v. MMK Holdings, L.P.*, No. 5:23-cv-182, 2024 WL 4052739, at *8 (W.D. Tex. Aug. 15, 2024), ("When a plaintiff invokes direct evidence of discrimination, summary judgment for a defendant is typically not warranted."), *report & recommendation adopted*, 2024 WL 4047163 (Sept. 4, 2024); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) ("[I]f a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case." (citation omitted)).

[71] *See Etienne*, 778 F.3d at 477 (emphasis added) (citing *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 417–18 (5th Cir. 2003)).

[72] *See Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002).

alone. She reported the conduct to Stephenson, who declined to investigate because he thought that his replacement should resolve the conflict.

After Stephenson's departure, McBee declined to investigate Liedtke's reports. But after Colaianni warned that Liedtke might file an EEOC or internal-affairs complaint, McBee issued an ESP within a day, adopting the men's accusations against her. The sequence matters: first came Liedtke's complaint; then came the officers' fear of an EEOC or internal-affairs complaint; then came the ESP.

The ESP itself had features a jury could find unusual. McBee had never before issued or heard of an ESP based on months-old "officer safety issues"—some of which a prior supervisor had already addressed. And McBee largely copied and pasted the allegations from Pruitt's text messages. Lieutenant Daniel testified that she would not have approved the ESP had she known that much of it came from Pruitt. Before all this, Liedtke had received repeated performance reviews praising her attitude and policing.

*     *     *

If Liedtke presents direct evidence of intentional sex discrimination, she can survive summary judgment unless the City proves it would have made the same employment decision anyway.[73] To show that workplace comments reflect direct evidence of discrimination, Liedtke must prove that the remarks were (1) related to her protected characteristic; (2) proximate to an adverse employment decision; (3) made by someone with authority over the challenged decision; and (4) related to the challenged decision.[74] Here,

---

[73] *See J.M. Huber Corp.*, 927 F.2d at 1327.

[74] *See Etienne*, 778 F.3d at 476 (citation omitted); *Clark*, 952 F.3d at 579 (specifying that the challenged employment decision must be "adverse").

No. 25-50717

the evidence is disputed, and summary judgment does not permit us to weigh its credibility or force.[75]

For starters, some of the offensive comments are contested. Colaianni denies stating to Liedtke that "pretty women [like her] get easy accolades." He also denies ever hearing another officer say that female APD officers are "either a bitch or a slut." If a factfinder determines those disputed remarks are true, they could indicate sex discrimination.[76]

Several additional questions remain. Were the offensive comments that Liedtke's colleagues made "stray remarks" or intentional discrimination?[77] Were the comments proximate to an adverse employment decision?[78] Was Liedtke constructively discharged from her role?[79] Was the ESP issued to Liedtke an "adverse employment action?"[80] Did Liedtke's colleagues influence McBee—the ultimate decisionmaker—to prepare the

---

[75] *Reeves*, 530 U.S. at 150 (collecting cases).

[76] *See Davis*, 14 F.3d at 1085 (holding that offensive comments like those quoted in *Price Waterhouse*, 490 U.S. at 235, are direct evidence of sex discrimination).

[77] *See Pullman-Standard v. Swint*, 456 U.S. 273, 287–88 (1982) (holding that intentional discrimination is a question of fact); *Etienne*, 778 F.3d at 476 (citation omitted) (distinguishing stray remarks from intentional discrimination); *Vaughn v. Edel*, 918 F.2d 517, 520 n.2 (5th Cir. 1990) ("We note that a finding of intentional discrimination, or of its absence, is a finding of fact." (citations omitted)); *Chaiffetz v. Robertson Rsch. Holding, Ltd.*, 798 F.2d 731, 734 (5th Cir. 1986) ("A finding of intentional discrimination *vel non* is a finding of fact." (citation omitted)).

[78] *See Etienne*, 778 F.3d at 476 (requiring proximity between offensive comments and an adverse employment decision).

[79] *See Haley v. All. Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004) ("Whether an employee would feel forced to resign is case- and fact-specific[.]").

[80] *See Hamilton*, 79 F.4th at 502, 506 (providing factual questions relevant to the adverse-action inquiry).

ESP?[81] If Liedtke has succeeded in showing intentional sex discrimination through offensive comments, does the City defeat the accusation by showing that "it would have made the same [employment] decision absent the evidence of discrimination?"[82] Each question is wrapped in fact disputes that preclude summary judgment.[83]

Whether the comments Liedtke describes amount to intentional discrimination is for a jury to decide. Viewed in the light most favorable to Liedtke, the remarks here appear at least as probative as those in *Price Waterhouse*.[84] We know that Pruitt vulgarly insulted Liedtke's appearance, Wilkes suggested that he and her fight, and Coker questioned Liedtke's birth-control practices. Stephenson and other officers apparently insulted Sergeant McBee's weight and lamented Lieutenant Daniel's pregnancies and motherly responsibilities. But the City, through Colaianni's testimony, denies that any of Liedtke's colleagues referred to female officers as being either a bitch or a slut. Colaianni also disputes that he attributed Liedtke's Honor Cadet award to her prettiness. The disputed and undisputed remarks certainly bear on Liedtke's protected characteristic—her sex. Only a jury can

---

[81] *See Haire*, 719 F.3d at 366 n.11.

[82] *See Etienne*, 778 F.3d at 477 (citation omitted).

[83] *See* FED. R. CIV. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Anderson*, 477 U.S. at 248 ("[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."); *cf. McKnight v. Cortez*, No. 5:22-cv-154, 2025 WL 951946, at *6 (W.D. Ky. Mar. 28, 2025) (BEATON, J.) (denying summary judgment where a "thorny tangle of facts surrounds" material questions).

[84] *See Davis*, 14 F.3d at 1085 (holding that the sexist comments in *Price Waterhouse*, 490 U.S. at 235, reflect intentional discrimination); *ante*, at 17–18.

No. 25-50717

ascertain the veracity of the disputed allegations, and a reasonable jury could find that the undisputed remarks are discriminatory.

Notably, the parties do not meaningfully dispute the proximity of the offensive comments to the challenged employment actions. But Liedtke's pleadings provide some clues. She quickly reported the parking-lot comments that Pruitt and Wilkes made. She also informally complained about her colleagues' conduct to Stephenson, but he responded minimally. Six days after Liedtke reported her shiftmates' behavior to McBee, Colaianni responded with allegations of his own against Liedtke. Just one day later, Liedtke received an ESP, and resigned a few weeks afterwards. Whether that timeline establishes proximity between the alleged discrimination and the ESP or constructive discharge is itself a fact-bound question. The parties provide little guidance, and proximity of discrimination is a context-dependent inquiry.[85]

The constructive-discharge theory is likewise fact-bound. The temporal proximity between Liedtke's complaints of harassment and her resignation at least supports an inference that her resignation followed the same chain of events.[86] Even so, we have held that "[w]hether an employee

---

[85] *See Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 401 (5th Cir. 2000) (affirming summary judgment for defendant where plaintiff failed to "offer evidence that the comments he complain[ed] of are . . . proximate" to the challenged employment decisions); *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 380 (5th Cir. 2010) (similar); *Mumfrey v. CVS Pharmacy, Inc.*, No. 1:10-cv-124, 2011 WL 13196441, at *2 (E.D. Tex. Aug. 19, 2011) ("A fact issue on temporal proximity and causal connection remains."); *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1232 (11th Cir. 2006) ("[T]emporal proximity between the harassment and a tangible employment action can give rise to a genuine issue of fact as to causation[.]" (citations omitted)).

[86] *Cf. Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 407 (5th Cir. 2021) ("The lack of a temporal connection between the alleged harassment and Johnson's resignation undermines his contention that he was constructively discharged." (citation omitted)).

would feel forced to resign is case- and fact-specific."[87] To prove constructive discharge, "an employee must offer evidence that the employer made the employee's working conditions so intolerable that a reasonable employee would feel compelled to resign."[88] Recognizing that an employee's constructive discharge can be an adverse employment action, the litigants dispute whether Liedtke's resignation meets that standard.[89] She argues that she endured intolerable conditions that caused her resignation, but the City asserts that Liedtke's documented underperformance was the basis for her resignation. A reasonable jury could credit either account.

Nor can we decide on this record whether Liedtke's ESP is an adverse employment action. As noted above, the district court mistakenly relied on First Amendment law in classifying adverse employment action as a legal, rather than factual, inquiry.[90] Perhaps that error is why the court gave short shrift to Liedtke's adverse-action allegations. Still, the district court is correct that performance-improvement plans do not always reflect adverse employment action.[91] In some instances, however, courts have held that performance-improvement plans can constitute adverse employment action.[92]

---

[87] *Haley*, 391 F.3d at 649.

[88] *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000) (quotation omitted).

[89] *See Thomas*, 223 F. App'x at 376 (first citing *Harvill*, 433 F.3d at 439; and then citing *Landgraf*, 968 F.2d at 431 (footnote omitted)).

[90] *See Liedtke*, 2025 WL 2692041, at *3 (citing *Breaux*, 205 F.3d at 161); *ante*, at 19–20.

[91] *See Liedtke*, 2025 WL 2692041, at *3–4 (citing *Fleming v. Methodist Healthcare Sys. of S.A., Ltd.*, No. SA-21-CV-01234-XR, 2024 WL 1055120, at *13 (W.D. Tex. Mar. 11, 2024)).

[92] *See Lemonia*, 2023 WL 6878915, at *7 ("[A] PIP does not constitute an adverse employment action unless it affects job title, grade, hours, salary, or benefits, or causes a

No. 25-50717

The adverse-action inquiry is context dependent.[93] Before *Hamilton* was issued, our court limited adverse employment action to "ultimate employment decisions," such as hiring, firing, promoting, and demoting.[94] Because that rule was based on an atextual reading of Title VII, we broadened adverse employment actions to include discrimination "with respect to hiring, firing, compensation, or the 'terms, conditions, or privileges of employment.'"[95] We have since recognized that a performance-improvement plan can "constitute an adverse employment action" if it "affects job title, grade, hours, salary, or benefits, or causes a diminution in prestige or change in standing among coworkers."[96]

The parties dispute whether issuing Liedtke's ESP is an adverse employment action. Citing the Department's standard operating procedures, the City asserts that the "ESP's sole focus" was improving Liedtke's

---

diminution in prestige or change in standing among . . . coworkers." (citation modified)); *see, e.g.*, *Ray v. Tandem Computs., Inc.*, 63 F.3d 429, 435–36 (5th Cir. 1995) (holding, in the retaliation context, that placement on a performance-improvement plan can be an adverse employment action); *Vandenberg v. Univ. of Saint Thomas*, No. 4:18-cv-379, 2020 WL 6822907, at *10 (S.D. Tex. Nov. 20, 2020) ("Being placed on a performance improvement plan may be the kind of 'adverse action' that could support a retaliation claim." (citing *Ray*, 63 F.3d at 435)); *Armstrong v. Marathon Petroleum Co.*, No. 3:16-cv-115, 2018 WL 2976732, at *10 (S.D. Tex. May 1, 2018) ("[T]he Court has determined that a PIP can be considered an adverse employment action[.]"); *Pollak v. Lew*, No. H-11-2550, 2013 WL 1194848, at *9–10 (S.D. Tex. Mar. 22, 2013), *aff'd*, 542 F. App'x 304 (5th Cir. 2013).

[93] *See Hamilton*, 79 F.4th at 502, 506 (providing questions relevant to the adverse-action inquiry); *Lemonia*, 2023 WL 6878915, at *7 (evaluating "evidence" to determine whether the plaintiff's "placement on a PIP . . . affected his employment.").

[94] *See Hamilton*, 79 F.4th at 499–500; *see, e.g.*, *Welsh*, 941 F.3d at 824 (holding that "a performance improvement plan is not an adverse employment action" because it is "not an ultimate employment decision" (quoting *Turner v. Novartis Pharms. Corp.*, 442 F. App'x 139, 141 (5th Cir. 2011))).

[95] *See Hamilton*, 79 F.4th at 506.

[96] *See Lemonia*, 2023 WL 6878915, at *7 (citation modified).

performance. So the City argues that Liedtke's ESP more closely resembles constructive feedback than a formal reprimand. The City's argument that the ESP was remedial, and not adverse, is compelling.[97]

At the same time, McBee testified that the ESP may have stigmatized Liedtke to other officers. McBee also stated that ESPs can eventually lead to an employee's termination. Although Liedtke's ESP did not affect her job title or salary, she has persuasively alleged that it diminished her prestige and changed her standing among coworkers.[98] Liedtke, moreover, indicates that the ESP prohibited her from riding solo during patrol duties, which appears to be a change in the "conditions" of her employment.[99] Given the City's and Liedtke's competing characterizations of the ESP, a jury—not a judge—should find whether Liedtke's ESP is adverse employment action.[100]

Next, we are uncertain if a person with authority over the challenged employment decisions—the ESP's issuance or the alleged constructive discharge—intentionally discriminated against Liedtke. As for the ESP's issuer, Liedtke does not allege that McBee made any sexist remarks. But

---

[97] *See Moye v. Tregre*, No. 22-30341, 2024 WL 65424, at *3 (5th Cir. Jan. 5, 2024) (per curiam) ("The remedial training requirement is, at most, 'differential treatment that helps the employee.' It is not an employment action 'that injures the affected employee.'" (quoting *Harrison v. Brookhaven Sch. Dist.*, 82 F.4th 427, 431 (5th Cir. 2023))).

[98] *See Lemonia*, 2023 WL 6878915, at *7 (providing that a performance-improvement plan can constitute adverse employment action if it leads to the plaintiff's "diminution in prestige or change in standing among . . . coworkers" (quoting *Welsh*, 941 F.3d at 827)).

[99] *See Hamilton*, 79 F.4th at 506.

[100] *See Reeves*, 530 U.S. at 150; *Hamilton*, 79 F.4th at 502, 506 (providing questions relevant to the adverse-action inquiry); *Lemonia*, 2023 WL 6878915, at *7 (considering uncontroverted "evidence" to determine whether the plaintiff's performance-improvement plan affected his employment (first quoting *Welsh*, 941 F.3d at 827; and then quoting *Stewart*, 586 F.3d at 332)).

Liedtke raises the cat's paw theory of liability and argues that Pruitt's discrimination should be imputed to McBee.[101] Because McBee prepared the ESP by incorporating Pruitt's written allegations almost word-for-word, Liedtke persuasively argues that Pruitt's discrimination tainted the employment action.

Liedtke's cat's-paw argument has purchase. For example, in *Laxton v. Gap Inc.*, we denied judgment as a matter of law for the defendant-employer because the plaintiff showed that her allegedly discriminatory colleague "served as [the] primary source of information" for the ultimate decisionmaker's employment action.[102] Although supervisors had independently investigated the informant's allegations against the plaintiff, we held that "[t]he degree to which [the supervisors] relied on the 'independent investigations' [was] a question of fact for the jury."[103]

The situation here is materially similar. McBee indicated that she largely copied Pruitt's allegations against Liedtke and pasted them to the ESP. Nevertheless, McBee asserts that she "reviewed the incidents" and "information" provided in Pruitt's texted allegations before importing them to the ESP. This case involves practically the same jury question as *Laxton*. To what extent did Pruitt (or other colleagues)—who may have intentionally discriminated against Liedtke—influence the ESP that McBee prepared? If Pruitt affected McBee's "decision or thought process" regarding the ESP, then he necessarily exercised authority over the employment action.[104]

---

[101] *See Haire*, 719 F.3d at 366 n.11.

[102] *See* 333 F.3d 572, 584 (5th Cir. 2003).

[103] *See id.* (citation omitted).

[104] *See Haire*, 719 F.3d at 366 n.11; *see also Roque v. Natchitoches Par. Sch. Bd.*, 583 F. App'x 466, 470 (5th Cir. 2014) (Mem.) (JOLLY, J., concurring) ("[T]he cat's paw theory typically applies where the ultimate decisionmaker . . . relies on evidence or advice

No. 25-50717

With respect to Liedtke's allegation that she was constructively discharged, similar factual questions remain. An employee's constructive discharge reflects adverse employment action.[105] But as explained above, Liedtke's constructive discharge is disputed.[106] And, if Liedtke proves that she was constructively discharged, she must still show that a colleague influenced that adverse action by intentionally discriminating against her.[107] Here, Liedtke alleges intentional discrimination by way of her colleagues' offensive comments. So she must connect the offensive remarks to her constructive discharge in order to prove intentional discrimination under Title VII.[108]

Finally, the City may defeat Liedtke's intentional sex-discrimination claim if a preponderance of the evidence proves that it "would have made the

---

from a subordinate who harbors discriminatory animus. The theory recognizes that the decisionmaker . . . often lacks the personal information to make the decision and must instead rely on 'performance assessments by other supervisors.'" (citation modified)).

[105] *See Thomas*, 223 F. App'x at 376 (first citing *Harvill*, 433 F.3d at 439; and then citing *Landgraf*, 968 F.2d at 431 (footnote omitted)).

[106] *See ante*, at 27.

[107] *See Etienne*, 778 F.3d at 476 (requiring an intentional-discrimination plaintiff alleging discriminatory comments to show that the remarks were "made by an individual with authority over the challenged employment decision"); *Haire*, 719 F.3d at 369 (holding that a non-supervisory employee may exercise authority over a challenged employment action by influencing the action).

[108] "Without belaboring the obvious, a resignation is an individual decision . . . made by the employee." *Shipes v. Trinity Indus., Inc.*, No. TY-80-462-CA, 1981 WL 65, at *32 (E.D. Tex. Nov. 24, 1981). But an employee's constructive discharge is distinct from a garden-variety resignation. "[A] constructive discharge is functionally the same as an actual termination[.]" *Penn. State Police v. Suders*, 542 U.S. 129, 148 (2004). Thus, although only Liedtke could control her resignation, her colleagues may well have influenced her constructive discharge.

31

same [employment] decision absent the evidence of discrimination."[109] That is a fact-laden inquiry.[110] On one hand, the City identifies at least six instances of Liedtke's underperformance, which are documented in the ESP.

On the other hand, the City does not dispute that McBee had never issued or heard of an ESP documenting months-old "officer safety" complaints—some of which another supervisor had addressed. Daniel, moreover, stated that she would not have approved the ESP if she had known that Pruitt authored much of its content. Liedtke's expert, Norton, testified that Liedtke's behavior did not warrant an ESP, and McBee's reliance on Pruitt demonstrated a lack of independent review. Whether Liedtke would have received the ESP but for her colleagues' animus is for a jury to decide on this record. And whether Liedtke would have been constructively discharged absent the alleged discrimination is genuinely disputed.

---

[109] *See Etienne*, 778 F.3d at 475, 477 ("If . . . the plaintiff presents direct evidence of discrimination, 'the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor.'" (quotation omitted)).

[110] *See Price Waterhouse*, 490 U.S. at 246 ("Instead, the employer's burden is most appropriately deemed an affirmative defense: the plaintiff must persuade the factfinder on one point, and then the employer, if it wishes to prevail, must persuade it on another."); *Etienne*, 778 F.3d at 475, 477; *Frobose v. Am. Sav. & Loan Ass'n of Danville*, 152 F.3d 602, 615 n.12 (7th Cir. 1998) ("[O]nce the plaintiff has presented direct evidence that a forbidden factor contributed to the employer's decision to take adverse action . . . a trial will normally be necessary in order to determine whether the employer would have taken the same action in the absence of the illicit consideration."); *Lawson v. Hinds Cnty. Sch. Dist.*, No. 3:12-cv-698, 2014 WL 373199, at *6 (S.D. Miss. Feb. 3, 2014) ("Though [the plaintiff] met his burden, the [employer-defendant] can still prevail by proving with a preponderance of evidence that it would have taken the same action anyway. It therefore proffers a number of legitimate, non-discriminatory reasons[.] While a jury could agree with those reasons, the Court may not weigh the evidence at the summary judgment stage." (citations omitted)).

No. 25-50717

\*    \*    \*

We therefore REVERSE summary judgment on Liedtke's sex-discrimination claim. The district court sidestepped the direct-evidence theory of discrimination, shortchanged Liedtke's adverse-action allegations, and applied an unduly narrow understanding of Title VII injury. We REMAND that claim for further proceedings.

## C. The Retaliation Claim Also Presents Triable Fact Disputes

The district court rejected Liedtke's Title VII retaliation claim for the same reason it rejected her sex-discrimination claim: no adverse employment action. That reasoning cannot carry the day here either. We therefore REVERSE summary judgment on retaliation and REMAND for further proceedings.

As with the sex-discrimination claim, we start with the statutory text. Title VII's anti-retaliation provision provides, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.[111]

Interpreting that text, our court holds that a plaintiff's "ultimate burden . . . is to prove that but for the employer's improper retaliatory motive, the allegedly retaliatory employment action would not have

---

[111] 42 U.S.C. § 2000e-3(a).

occurred."[112] A plaintiff can meet her burden by presenting direct or circumstantial evidence of retaliation.[113]

Proving retaliation through circumstantial evidence requires plaintiffs to proceed through the *McDonnell Douglas* burden-shifting framework.[114] Under that framework, the plaintiff must first show that: (1) she engaged in protected activity under Title VII; (2) the employer took adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse employment action.[115] If the plaintiff establishes a prima facie case, the burden "then shifts to the employer to articulate a legitimate, . . . nonretaliatory reason for its employment action."[116] Insofar as the employer satisfies that requirement, the plaintiff must prove that the employer's proffered reason is not true, but instead pretext for the real, retaliatory purpose.[117]

An adverse employment action for purposes of retaliation claims, as opposed to discrimination claims, is a "materially adverse action."[118] Any

---

[112] *See Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 547 F. App'x 484, 488 (5th Cir. 2013) (hyphenation omitted) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013)).

[113] *See id.* (citing *Washburn v. Harvey*, 504 F.3d 505, 510 (5th Cir. 2007)).

[114] *See id.* at 489 (first citing *Banks v. E. Baton Rouge Par. Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003); and then quoting *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002)).

[115] *See id.*

[116] *See id.* (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007)).

[117] *See id.* (quoting *McCoy*, 492 F.3d at 557).

[118] *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation omitted).

No. 25-50717

employment action that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination'" is materially adverse.[119]

1. The Retaliation Evidence Is Circumstantial, Not Direct

Liedtke overstates her allegations as direct evidence of retaliation. Direct evidence, as defined above, is a statement or document showing on its face that an improper criterion served as a basis for the adverse employment action.[120] In the retaliation context, direct evidence is exceedingly rare because employers usually refrain from "expressly stating that an impermissible criterion influenced his decision" to undertake adverse employment action.[121]

Liedtke identifies two pieces of evidence she labels direct: (1) Colaianni's complaint to McBee about her policing, and (2) McBee's statement to Daniel that Liedtke's shiftmates feared a possible EEOC or internal-affairs complaint. Neither is direct evidence. Both require an inferential step.

First, Liedtke refers to Colaianni's complaints about her police work to McBee. Although Colaianni began that discussion by explaining that he and his colleagues were worried about Liedtke filing an EEOC or internal-affairs complaint, his remark is attenuated to the alleged retaliatory actions: Liedtke's ESP and constructive discharge. Colaianni, moreover, did not tell McBee that he was complaining against Liedtke *because* he feared that Liedtke would file an EEOC or internal-affairs complaint. For Colaianni's comments to show retaliation, therefore, one must infer that his complaint

---

[119] *See id.*

[120] *See Clark*, 952 F.3d at 579; *ante*, at 17.

[121] *See Fabela*, 329 F.3d at 415.

about Liedtke's policing was pretextual, and that it caused the stated adverse employment actions.[122] So Colaianni's arguably pretextual complaint about Liedtke is, at most, circumstantial evidence.

McBee's statement to Daniel fares no better. It shows that Liedtke's shiftmates feared a possible EEOC or internal-affairs complaint. But it does not, on its face, show that McBee issued the ESP—or helped secure approval for it—because of protected activity. At most, it helps explain how the ESP moved forward.

So unlike the sex-discrimination claim, which rests in part on facially sex-based comments, her retaliation claim depends on circumstantial evidence.

2. The Circumstantial Evidence is Enough to Reach a Jury

Liedtke provides circumstantial evidence of retaliation that prevents summary judgment. The *McDonnell Douglas* burden-shifting framework governs.[123]

At this stage, Liedtke need not prove the prima facie case. She "must simply raise a genuine issue of material fact as to the existence of a prima facie case."[124] She has done so.

At step one of the *McDonnell Douglas* test, Liedtke must show that: (1) she engaged in protected activity under Title VII; (2) the employer took adverse employment action against her; and (3) a causal connection exists

---

[122] *Cf. Rodriguez*, 820 F.3d at 765 (quotation omitted) (stating that direct evidence requires no inferences).

[123] *See McDonnell Douglas*, 411 U.S. at 802–803.

[124] *Rhodes v. Runyon*, 95 F.3d 48, 48 (5th Cir. 1996) (per curiam) (unpublished) (citing *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 640–41 & n.8 (5th Cir. 1985)).

between the protected activity and the adverse employment action.[125] She easily satisfies the first prong of that framework. Liedtke alleges that she was retaliated against because she filed internal complaints of workplace discrimination. And "[a]n employee that files an internal complaint of discrimination engages in a protected activity."[126]

Did she suffer materially adverse action? The answer to that question is unclear on the facts before us. We have held, as a matter of law, that an employee's constructive discharge constitutes "materially adverse" employment action.[127] Whether Liedtke's discharge was constructive, however, is an open factual question.[128] Similarly, the court in *Lemonia* confirmed that a performance-improvement plan constitutes an adverse employment action for purposes of retaliation, so long as the plan affected an employee's job title, grade, hours, salary, or benefits, or caused "a diminution in prestige or change in standing among . . . co-workers."[129] In our sex-discrimination discussion above, we held that Liedtke raised a genuine dispute that the ESP affected the conditions of her employment by diminishing her standing among coworkers and restricting her ability to patrol alone.[130] To the extent Liedtke proves that she was constructively

---

[125] *See Etienne*, 547 F. App'x at 489 (quotations omitted).

[126] *See Rodriquez v. Wal-Mart Stores, Inc.*, 540 F. App'x 322, 328 (5th Cir. 2013) (per curiam) (citing *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 194 (5th Cir. 2001)).

[127] *See Thomas*, 223 F. App'x at 376 (first citing *Harvill*, 433 F.3d at 439; and then citing *Landgraf*, 968 F.2d at 431 (footnote omitted)).

[128] *See ante*, at 27.

[129] *See Lemonia.* 2023 WL 6878915, at *6–7 ("We have held that a PIP can support a retaliation claim." (citations omitted)).

[130] *See ante*, at 28–30.

discharged, or that the ESP was materially adverse, she satisfies the second prong of the *McDonnell Douglas* test.[131]

Next, Liedtke raises a genuine dispute on causation between her protected activity—reporting her colleagues' misconduct—and the alleged retaliation.[132] True, the City persuasively argues that Liedtke's underperformance caused her constructive discharge and receipt of the ESP. But she received the ESP just one day after complaining to McBee about her shiftmates' behavior. And she resigned a few weeks after the ESP issued. That temporal proximity supports a reasonable inference that the City retaliated against her for complaining about her colleagues.[133] On McBee's telling, moreover, Colaianni expressed fear about Liedtke filing an EEOC or internal-affairs complaint against him and other officers just moments before accusing Liedtke of unsafe policing. The disputed circumstantial evidence regarding causation is for a jury to decide.[134]

Because a reasonable jury could believe that Liedtke has shown a prima facie case of employment retaliation, the burden shifts to the City to

---

[131] *See Etienne*, 547 F. App'x at 489 (citations omitted).

[132] *See id.* (citations omitted).

[133] *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (observing that "very close" temporal proximity "between an employer's knowledge of protected activity and an adverse employment action" is "sufficient evidence of causality to establish a prima facie case."); *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 807–08 (5th Cir. 2007) (emphasizing that temporal proximity alone is insufficient to show causation unless the employee's protected conduct was "very close" to the employer's alleged retaliation).

[134] *See Smith v. Xerox Corp.*, 371 F. App'x 514, 520 (5th Cir. 2010) ("[T]he existence of a causal link between protected activity and an adverse employment action is a 'highly fact specific' and difficult question." (citing *Nowlin v. Resol. Tr. Corp.*, 33 F.3d 498, 508 (5th Cir. 1994))).

"articulate a legitimate, nonretaliatory reason for its employment action."[135] The City has done so. On summary judgment, the City is also required to "show that any reasonable jury would conclude that it *would* have made the same decision absent the discrimination."[136]

The evidence on pretext is disputed, but a reasonable jury could credit Liedtke's account. Liedtke's allegation that McBee had never issued or heard of an ESP documenting months-old complaints of unsafe policing is undisputed. Daniel, moreover, testified that she would not have approved the ESP if she had known that McBee relied chiefly on Pruitt's version of events. And Norton, a policing expert, asserted that Liedtke's conduct did not merit an ESP. Thus, although the City points to Liedtke's underperformance, a reasonable jury could conclude that the City's stated reasons were pretextual.[137]

\* \* \*

Because genuine disputes of material fact remain regarding Liedtke's retaliation claim, we REVERSE summary judgment on that issue and REMAND for further proceedings.

## IV. Conclusion

One claim is out; two must go back. Liedtke forfeited her hostile work environment claim by failing to brief it as a freestanding appellate issue. But her sex-discrimination and retaliation claims turn on contested facts: what

---

[135] *See Etienne*, 547 F. App'x at 489 (citation modified).

[136] *See Etienne*, 778 F.3d at 477 (emphasis added) (citing *Fabela*, 329 F.3d at 417–18).

[137] *See Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 477 (5th Cir. 2015) ("[T]he pretext inquiry is asking the ultimate question whether a jury could find that discrimination caused the termination." (citation omitted)).

motivated the ESP, what effect the ESP had, whether her resignation was constructive discharge, and whether the City's reasons were pretextual. Those are jury questions.

We therefore AFFIRM as to hostile work environment, REVERSE as to sex discrimination and retaliation, and REMAND for proceedings consistent with this opinion.